Mr. Cervantes, you may proceed I'm Leonard Cervantes, I represent the plaintiff We have one issue for the court to consider and that is whether or not the trial court, Judge O'Connor, aired and abused his discretion when he admitted an exemplar video presented by the Burlington Northern Santa Fe Railroad. This was identified as Exhibit 33, Defendant's Exhibit 33. It was made nine years after the accident in question. It purported to show the defendant's expert witness's view of the track seven years after the accident in question but there was never any foundation light to show that that was the view that the crew had on the night of the accident. And so in many ways I guess this is sort of a law school or basic evidentiary issue. Was a foundation sufficiently laid to allow the admission of this exhibit? And whether they call it demonstrative evidence or demonstration or merely an exemplar, whatever word you use to call this, it required some sort of a foundation that had to be shown either to be substantially similar to the location at the time of the occurrence of the conditions or it had to be shown to be an accurate portrayal of what it purported to show. But there was absolutely no foundation and the only way a foundation could have been laid to show that it fairly and accurately showed what the crew could have seen would have been perhaps for a crew member to testify, but no crew member ever testified. So what we had was an expert witness hired by the railroad who was a former employee of the Burlington Northern Santa Fe and a regular expert for the railroad testifying. I never saw this video that was made within a year of the trial, but I was out there seven years after the occurrence and this video looks like what I saw seven years later and yet there was no testimony established. It showed what the crew would have seen nine years prior to making the video and the video was so prejudicial because as you probably recall from the briefs, this case was one of the simpler cases to try in terms of a railroad crossing case. We stipulated to nearly 14 items of evidence and the only real issue was could they have seen the car stuck on the tracks in time to have stopped. We stipulated that the stopping distance was, I forgot the exact number here, but it was about 2,500 feet and we stipulated that when they say they saw it as it came around the crossing, that was about 7,500 feet. At 3 quarters of a mile, it was in excess of 2,500 feet and at a half a mile, all of those landmarks were part of the testimony of the crew, the two crew members who said we saw this car stuck on the tracks with flashing lights at these various distances and this would have been a summary judgment case for the plaintiff but for the fact that the crew members changed their testimony and their deposition in their trial and they denied ever having made those statements. So now it comes down to the issue of what did they see. So we had this video and I assume you all had a chance to see the video but I don't know if you have. We asked if we could present it today, we were told not to play the video, but the video shows a very grainy, poor quality video of a train coming down the tracks nine years later without any foundation as to what the conditions were, we don't even know about the train, we don't even know if it was similar to the train in question, we don't know if it had the same number of headlights the train in question was stipulating. We know nothing about this train, we heard nothing from the Burlington Northern employee that the train or the video had any foundation for it. All we had was an expert witness retained by the defendant who said this video looks like what I saw seven years later, that's all we had. But the video was so prejudicial and I hope you've had a chance to see it because it was so grainy and such a poor quality that anybody who sees that video would say how could they possibly have seen what they told the police officer within a day after the accident that they claimed to have seen because they told the investigating officer that they saw that car stuck on the tracks at various distances and based on the stipulation if they saw the car at any of those distances then they could have stopped in time. To avoid the collision. If we were to find that it was improperly admitted, how do you get over the hurdle of the jury returning the general verdict? So we have the issue of the comparative fault and how do we overcome that based on, even if we find that the video should not have been admitted. Well I think that's entirely consistent, the video caused the jury to think there wasn't any fault on the part of the defendant, they couldn't possibly have seen the car stuck on the tracks with the flashing lights, the white car on the tracks which was not shown in the video and therefore a verdict entirely in favor of the defendant is appropriate under those facts, I think this isn't a question of comparative fault, contributory faults, it's a question of whether or not there was any fault on the part of the defendant. This is a question of the jury exonerated the defendants outright based on the video which was so prejudicial that it caused them to think there's no way that the members of the crew, the two members who both admitted to the police officers that they saw the car on the tracks at distances which were sufficient to stop the train and so that's the crux of the case, as I say. But for the fact that they changed their testimony and said we didn't say that to the police officer in their deposition in that trial, this would have been a summary judgment for the plaintiff because based upon the testimony recorded by the police officer, they could have stopped that train at any one of those three distances and avoided the collision to the plaintiff. And so we cited many, many cases in the brief, maybe far too many, but I think that there are two that are particularly important, one is French versus the city of Springfield which is mentioned in our brief and then the other one is Lorenz versus Pledge. Both of these cases involve videos and in both cases the videos were rejected and the court reversed the verdict based on the omission of the videos because they felt that these videos were used to, to use the words of the courts, precondition the minds of the jurors to see that party's view of the case and that's exactly what was done here. This video was used to, as the other courts have said, precondition the minds of the jurors to find the defendant's view of the case. They said to the police officer, we saw the car at these distances, it's recorded, the statements are mentioned in the brief, there were three or four different statements to that effect and so there's no question, if that's where they saw this car, they could have stopped. So the defense was, well, we really couldn't see the car at that distance, forget what we said, don't pay attention to that, we deny saying that to the police officer, oh and by the way, here's a nine year old, here's a video made nine years later that is not substantially similar, it is not an accurate portrayal of what it purports to show and the only people who could have laid that foundation would have been the members of the crew. But they were never asked about that. So we have a third party expert witness who says, I went out there seven years later and this shows what I saw seven years later at a different time of the year. How long after the incident was the expert witness out there taking the train trip the same way? Seven years later, after the incident. The incident occurred on November 27, 2005, their expert Mr. Heckler visited the scene on August 9, 2012 and the video was made on January 7, 2014 and not a single shred of foundational evidence was laid for the admission of that video. It doesn't make any difference what you call it, reenactment, demonstration, whatever it is, it required some foundation to admit that in and the prejudice is clear because they said they could see it and they present a video that appears to be of such poor quality that no one could see anything if you look at that video. Have you had a chance to see it? Let me ask you this, don't you think a jury could reasonably find that the decedent could have stepped out of that car as the security guard asked her and walked away with the security guard and not been killed? Well the judge said that there was evidence sufficient to submit that issue to the jury and so I guess they could have found that. And how do we know they didn't? Well we don't know that but I think that the prejudice can be presumed from the admission of the video. I think that, well let's put it this way, in a real day to day situation if the jury thought that the plaintiff was partly at fault and the defendant was partly at fault then there would have been a contributory negligence verdict of some sort. But in Illinois if it's 51% or more you're out the door, right? Right, right. And we don't know what the jury did with that. Is there a mechanism to ascertain from the jury? Not that I'm aware of judge, maybe you're aware of something that could have, I suppose it could have been a question or an interrogatory submitted to the jury, I don't know if that's done. It wasn't done in this case so we don't know that. But I think that it's clear to me that prejudice can be presumed on the basis of the fact that this video so greatly distorts what the crew would have seen and that it was not identified by a single crew member. As I say it's sort of basic evidence 101. In order to get a photograph or videotape or something into evidence it has to be shown that it's substantially similar to the issue in question, that it purports to show, it's an accurate portrayal of what it purports to show, it's a fair and accurate representation. None of that's there. Thank you. So all we have is this distorted video, which totally misled the jury as to what the view was of the crew. And as I say, to use the language of the cases that I referred to, it preconditioned the jurors' minds to see the defendant's point of the case. But there was nothing about that video that would influence the jurors one way or another as to whether the decedent could have walked away from that car. No, there is not. There is not. And I mean we can argue about that. I know I don't have a whole lot of time. The issue about the comparative fault or the negligence of the decedent was argued. We didn't think there was enough evidence. I didn't bring that up on the appeal. But she got out of the car. She got back into the car. It seemed reasonable for her to try to get the car off the tracks rather than abandon the car. And there was testimony that she couldn't get the door open and neither could the woman who was attempting to help her. So there was evidence from which the jury could find, well, she was stuck in the car. She couldn't get the door open again. And we even presented some evidence about the doors and how they lock on a Toyota Camry and how she might not be able to get that door open once she got back in. And in the heat of things, panicked and couldn't get out. Could the jury still find it? I assume they could. I'm not going to argue something that is facetious. But I think that this video was so prejudicial that it just caused the jury to exonerate the railroad entirely. And for that reason, we should be granted a new trial. Thank you. Thank you, Mr. Sands. May I close the court also? This is a relatively simple case. It was tried in Rock Island County. There were basically two issues that were presented, two broad issues, to the jury to decide. Negligence on the part of the crew, Mr. Cox and Mr. Ryan, in failing to stop before this accident happened. And also, negligence on the part of the decedent driver who was found, got her car off the crossing, off the private crossing of the Tyson food plant, which is a private road, got her car off the crossing, stuck, got out of the car under the evidence because she was seen by witnesses as the record reflects. And then a security, the gate guard, come out and she's back in the car. And the gate guard pulls with her to get out. She has her hands on the steering wheel and she says she can't. And the accident happens. And all that time, the lights were flashing at the crossing. The train was coming. The whistle was blowing. And she didn't get out of the car. Now, the issue as far as the negligence is concerned on the part of the crew is that the crew members, about three days after the accident, got a call from the deputy sheriff. And the deputy sheriff talked to them and took notes. And the deputy sheriff testified that his understanding of what they told him was that when they were three-fourths of a mile, or actually it's a mile and four-tenths from the crossing, they saw something that looked like a car on the crossing. When they testified that no, he had to misunderstand us, we didn't tell him that. We couldn't see anything, even the crossing itself, when you're that far away. So that's the issue. Visibility is certainly an issue. But so those are the things that are presented. There's two ways that this court can handle this case and dispose of it. Number one is, as already been mentioned, this was a general verdict. And a general verdict, there's a presumption that there was no special interrogatories. There's a presumption that the jury would decide on all the theories in the case. So even if there were some abuse of discretion, which there wasn't on the part of Judge O'Connor, then that would not affect the issue of her contributory negligence of being more than 50% and causing the accident. If this video is so prejudicial in nature that it would lead the jury to believe that the engineer and conductor had no liability, that they didn't do anything wrong, then the only option would be for that jury to find, well, her car was sitting there and she didn't get out or couldn't get out or whatever. So any fault on her part would be then greater than 51% if the video completely absolves them. If the video was so prejudicial, if there was some evidence that was introduced that was so prejudicial to the jury and so made the jury in some fashion do that, then I can see that argument being made. But that's not the case that we have here. And although the jury, although our position is the jury, under these facts easily could have found that she was more than 50% at fault. But the second problem is that there was no error on the part of the trial judge allowing this video to be used by Mr. Heckler, our engineer. And you have to understand this. We hired a railroad expert. He was a very good expert. He did a lot of things. He analyzed the data, the event-recorded data, the stopping distances. He looked at the crossing. He went out and he rode a locomotive toward the crossing, around the curve, three-fourths of a mile back, and he observed what he could see at various points at the one point of the mile and four-tenths point, the three-fourths of a mile point, the half-mile point, the whistle point, and all of that testimony that the crew had already said what they could see in the testimony. The only evidence we have that they did not, to the contrary, would be the deputy sheriff, who testified that he understood then to say something totally different. So in the process of Mr. Heckler, our expert, who gave opinions, and there's no dispute, his opinions that he testified to are not in dispute, nor were they objected to. He, in one of the things that he did in his analysis of this problem to be able to testify, was ride a locomotive toward the crossing. He made observations from that locomotive. Now, the evidence video, the video that he used in his deposition as testimony at trial, he laid a foundation for that because it was demonstrative evidence of his substantive testimony. What's happened here in the plaintiff's brief is they're confusing what the judge ruled with respect, they're confusing the offer of this video as being substantive evidence, and it wasn't offered as substantive evidence. It was only offered as demonstrative evidence of what the substantive evidence of our expert, Heckler, said or testified to as he approached the crossing. So all the cases that are cited about substantive evidence are all meaningless as far as this context is concerned because the video was offered only to show, only as an aid to the jury, so that the jury could understand what our expert was saying as to what he saw the visibility was approaching the crossing. Why do they need an aid in understanding when you've got an English language speaking expert saying, this is what I saw or didn't see? I think that... An aid in understanding is usually for something a little more complex. Your Honor, isn't it true, wouldn't it be correct, though, that it would be much easier for the expert to say and describe an aid to the jury as to what he actually saw with a picture rather than without a picture? In other words, I don't know how many words it would take for that expert to show. In criminal law, in criminal trials, we try men for lives with just words. Yes, that probably could be. But the point is, there's no evidence here and the record doesn't reflect any abusive discretion on the part of the judge in putting, letting this testimony in. And during the trial, during the testimony of our expert, there was no objection made at all. The video, I mean, there was discussion about whether or not it was made and the conditions were substantially similar. Instead of having a car parked on the tracks, they parked something to the north of the tracks and they don't have the lights on or they don't have, you know, there was snow then. There wasn't snow the night of the accident. All of these things that, you know, the expert put into this video and then, you know, when you compare it to what the conditions were in the accident, there's a lot of differences. There is differences, and if the video was being offered as substantive evidence, if it was offered in order to show what the conditions were at the time of the accident, you're right, there'd be a different foundation that has to be laid. And the cases all support that, that there has to be similarities. But it wasn't offered as that kind of an evidence. It wasn't offered to show what the crew saw. In other words, there's no testimony in the record that that video or the testimony of Mr. Heckler showed what the crew saw, because the crew justified themselves what they saw. So there's just totally a different thing. If it were offered as substantive evidence, then there would have to be a big foundation laid. But it wasn't, and the foundation that was laid was when Mr. Heckler said and testified both on a direct examination and on cross-examination that that video shows what I saw and is consistent with what I saw when I was on the train approaching the... What was the purpose of Mr. Heckler in your mind? What is his expertise? You have the crew saying on the night of the incident, this is what we saw or didn't see. Yes. So what's Heckler doing? Well, the plaintiff had two experts, and we had to have an expert. And their expert said that the crew didn't act properly because they should have blown the whistle, they should have slowed down, and all of that. So we needed an expert. So that was the reason. And also, visibility was very important, the issue of visibility. It's interesting that the plaintiff's experts never went to the crossing. One of them went, I think, the day of the trial or the day before. But they didn't do any of the things that Mr. Heckler did. And so most of these cases, you know, are turned on an expert. Two minutes. Pardon? Two minutes. Okay. So I request that the court affirm the judgment of the Black Island Circuit Court and decide this case in favor of the defendant. Thank you very much. Thank you. Mr. Cervantes for rebuttal. One other thing that was mentioned about the general verdict, the jury could have found that neither the plaintiff nor the defendant were at fault in this case. In a general verdict, couldn't they have found that nobody was at fault and therefore they found in favor of the defendant? So you raise that question about that. But in response to one of the things that the opposing counsel mentioned, somehow or another the members of the crew denied having made these statements to the police officer. Well, I don't want to argue the facts of the case. We're really here to argue the law. But in that regard, the police officer took separate statements from both of the members of the crew, the conductor and the engineer who were both riding in front of the engine. And they both admitted having seen the car stuck on the track. So this question about whether the police officer somehow got it wrong, well, then I guess he got it wrong twice. But I want to go back to a couple of things that were mentioned. I had asked prior to our argument about using some photographs that were in the record and whether you give me permission to use them or not. They're all in the record. I'll just refer to them by exhibit number unless you want me to just refer to them now. One of them was an exhibit, the overhead view that was used by both sides. This was called Exhibit 28 and Plaintiff's Exhibit 28, Court Exhibit 1. This was an aerial view of the scene. And this purported to show everything that was described in here and was marked at the various distances. This is in the court file, and I believe that can be found at page 419 in the supplement to the record on appeal. So there was no need to have a video to show what the condition was like. Everybody admitted this is a straight track, unobstructed view for over a mile. When they came around the bend, everybody admitted there was nothing to obstruct their view. And another reason why that video didn't need to be used, but even under the accepting the explanations that the defendant has offered to either familiarize the jury with the lay of the land or to show visibility, these things are dealt with in the two cases that I mentioned, French v. City of Springfield and Lorenz v. Pledge. The French case is almost identical in the sense that they say that the party offering the exhibit was using it to familiarize the jury with the scene of the occurrence. But they found that the exhibit showed more than that, and that's when they came up with the statement that this was merely being used to precondition the minds of the jurors. They found it to be inadmissible, it was prejudicial, and it was grounds for a new trial. Well, let me just ask you, looking at that, even the photos, would you agree that it's at least, from the same distances, would you agree that it's at least as easy to see a railroad locomotive as it is to see a car? I would think so. I would think so. I mean, if that goes to the issue of comparative fault, contributory negligence. In other words, if the folks on the train could see her, she could see the train. Well, there's evidence that the woman outside of the car who was trying to help the lady inside of the car move it off the tracks eventually saw the train and ran away. But she tried to get the lady inside to open the door, and she said she couldn't get the door open. So there was that testimony. So now she's stuck in the car. This is the security guard? The security guard was on the outside trying to help. Right, trying to help the security guard. Trying to help the deceit. There was no attempt to break a window or anything like that? The window was down. The window was down, according to the testimony. But she couldn't reach in and get the door open. The window was down? The window was down. And the lady's too large to crawl out of the window? The lady's, I'm forgetting what her age was, late 70s, early 80s, apparently she wasn't able to crawl out the window. I see you raising your eyebrows, but this all happened very quickly. She was trying to get her car off the tracks, which seems reasonable, but the point is that the video itself just totally changed the nature of the case. These men said we saw the car at those distances. Therefore, if they saw the car at those distances, they could have stopped. And the video was used to give the misimpression that they couldn't see the car at those distances. And I don't even think there's anything mentioned in the testimony by either side about whether they said they could or they couldn't later on. They just denied giving those statements to the police officer. Thank you. So this evidence became, we'll say, the third witness to show that the members of the crew couldn't see what they claimed they saw. I think I said at the time, quoting Yogi Berra in a book of his, I never really said what I said. The train crew members were saying I never really said that to the police officer. And here's a video to show what I could actually see. I'm just repeating myself. The case law is there. It's well established. I think it's clear that no matter what excuse they used to admit this video, no foundation was laid under any explanation. And it so severely prejudiced the jury. And the last thing I wanted to say was they acted like it's not really prejudicial. The whole closing argument, which is mentioned in my brief, is focused on that video. And he argues to the jury, well, you can't see anything. You can look at the video. And the video is played in its entirety in its three minutes length in the closing argument. And everything is focused on what the jury can or cannot see in that video. And generally in cases where we complain about the evidence and the evidence is so greatly highlighted in the closing argument, that's when courts generally find it to be prejudicial because that's what they relied on in this case. And you can take a look at my brief for the record. The quotes to the closing argument are contained there. I know I don't have enough time. But that's what was emphasized. And that's why the plaintiff was severely prejudiced and was denied a fair trial. And we're asking the court to reverse the outcome and give us a new trial. Thank you. Thank you. Thank you very much, both of you, for your arguments here today. This matter will be taken under advisement.